# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION
## AT LONDON

CIVIL ACTION NO. 15-146-DLB-EBA

EQT PRODUCTION COMPANY                                                          PLAINTIFF

VS.                              **MEMORANDUM OPINION AND ORDER**

VORYS, SATER, SEYMOUR
AND PEASE, LLP, et al.                                                          DEFENDANTS

* * * * * * * * * * * * * * *

EQT Production Company was hauled into court six years ago regarding their rights and ownership in certain oil interests in southeastern Kentucky. EQT lost in that action and was forced to convey properties and pay approximately $14 million in trespass damages. EQT, claiming that their former attorneys are responsible for those damages, initiated the instant action. The Court therefore must drill down through the underlying litigation and explore whether EQT's attorneys are potentially liable for legal malpractice.

Defendants John Keller and Vorys, Sater, Seymour and Pease, LLP (collectively, "the Vorys Defendants") and Dale A. Phillips and Phillips Law Office (collectively, "the Phillips Defendants") seek judgment as a matter of law in their favor on Plaintiff EQT Production Company's ("EQT") legal-malpractice claims against them. Specifically, both the Vorys Defendants and the Phillips Defendants argue that EQT's legal-malpractice claims are barred by the statute of limitations and that EQT has failed to create a genuine issue of material fact regarding whether the Vorys Defendants or the Phillips Defendants committed professional negligence in their representation of EQT. The Court has

jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the spring of 2001, EQT decided to sell certain oil interests on thousands of noncontiguous acres throughout southeastern Kentucky—primarily in Leslie, Letcher, and Perry Counties.[1] (Docs. # 71 at 4; 74 at 6-7). The contemplated transaction involved three types of property interests: properties that EQT owned in fee simple, properties that EQT leased from third-parties, and existing wells that EQT owned, along with the associated equipment and pipelines situated on the property. *Id.* EQT operated some of these properties with a joint-venture partner, KRCC Oil and Gas Company ("KRCC"). *Id.*

In preparation for the offering, Joe Morris, EQT's Vice President of Geoscience, and Lester Zitkus, EQT's Vice President of Land, drew maps with tract outlines around the oil fields EQT wished to sell. (Doc. # 74-1 at 4). Several of these maps outlined in blue ink some of the properties that EQT owned. (Docs. # 74-2; 74-3; 74-4). EQT also established a Data Room, which contained a Data Room Summary that detailed information about the properties and assets offered for sale, instructions for bidding, a Purchase and Sale Agreement, and an Assignment. (Doc. # 74-7).

After establishing the Data Room, but before the bid deadline, EQT retained John Keller, a partner at Vorys, Sater, Seymour and Pease, LLP, to represent EQT in the anticipated transaction.[2] (Docs. # 71 at 5; 74 at 8; 74-8). On August 30, 2001, Journey Acquisition-II, LP ("Journey") submitted a collective bid of $70,700,000, with $64,090,000 offered for EQT's interests and $6,600,000 offered for KRCC's interests. (Docs. # 71 at

---

[1]    Property interests in western Kentucky were also offered for sale. (Doc. # 74-7 at 7).

[2]    Keller and Vorys also represented EQT on other occasions and in other transactions. (Doc. # 74-6 at 11-14).

5; 74 at 8; 74-10).  Along with its bid, Journey presented the draft Purchase and Sales Agreement, with red-lined comments.  (Doc. # 74-10).  Because Journey was the highest bidder, EQT and KRCC accepted Journey's offer.  (Doc. # 74 at 9).

On September 3, 2001, Zitkus made additional comments on the red-lined Purchase and Sales Agreement and faxed the document to Keller the next day.  *Id.*  Of particular relevance, Zitkus claims he made a note next to Section One of the Purchase and Sale Agreement ("PSA"), entitled "Property to be Sold and Purchased," instructing Keller to "Reference Boundaries."  (Doc. # 74-10 at 14).

On September 5, 2001, at EQT's suggestion and with EQT's consent, KRCC also retained the Vorys Defendants.  (Docs. # 74 at 10-11; 74-12; 74-13).  Jointly representing the sellers, Keller amended EQT and KRCC's Joint Venture Agreements, and also made revisions to both EQT's and KRCC's PSAs.  (Doc. # 74 at 11-17).  Over the month of September, EQT, KRCC, and Journey negotiated the details of the transaction.  (Docs. # 74-6 at 73-75; 74-11; 74-14).  At the same time, EQT, KRCC, and Keller exchanged and revised numerous versions of the Amended Joint Venture Agreements.  (Docs. # 74-6 at 148-51; 74-11; 74-16).

Although Keller was tasked with drafting and revising the various agreements, including some of the exhibits, EQT prepared the maps that were attached to the agreements.  (Docs. # 71-2 at 4; 74-6 at 57-58, 141, 194-95).  The Blue Line Boundary Maps, which Zitkus and Morris had prepared for the Data Room, were attached to the PSAs.  When attached to the EQT PSA, the Blue Line Boundary Maps became Exhibit N.  (Docs. # 71-18 at 195-206; 74-19 at 196-207).  When attached to the KRCC PSA, the Blue Line Boundary Maps became Exhibit J.  (Doc. # 74-20 at 111-116).

As of September 28, 2001, neither the EQT PSA nor the KRCC PSA contained references to the Blue Line Boundary Maps in Section One or Section Eighteen. (Doc. # 74 at 15). Sometime between September 28 and October 4, 2001, however, KRCC contacted Keller and requested that he "clarify" the PSA to limit the transaction to the "properties within the Blue Line Boundary Maps." (Doc. # 74 at 15). Notably, Keller made the requested changes to the KRCC PSA. *Id.* Specifically, he added references to Exhibit J and limiting language to two sections of the KRCC PSA: Section One, the "Property to be Sold and Purchased" section and Section 18, the "Further Assurances Clause." *Id.* at 15-16. After the changes, the relevant portions of those sections read as follows:

> 1. **Property to be Sold and Purchased.** Seller agrees to sell and Buyer agrees to purchase, for the consideration hereinafter set forth, and subject to the terms and provisions herein contained, the following described properties, rights and interests:
>
> ...
>
> The Leasehold Interest, Wells, Pipelines, rights and interests specified in the foregoing subsections (a), (b), (c), (d) and (e), exclusive of the properties, rights and interests excluded herein, are herein sometimes collectively called the "Oil and Gas Properties," or "Properties". The Properties do not include, and there is hereby expressly excepted and excluded therefrom and reserved to Seller all property not described above or being included in this Agreement, including but not limited to the following: … 2) with respect to *lands located outside of the areas shown on Exhibit J* and with respect to deep rights reserved by Seller, all right, title and interest Seller owns or has a right to acquire under any AMI[3] agreement covering the Properties (regardless of whether an assignment has been made to Seller or not as of the date of this Agreement)…

(Doc. # 74-20 at 11) (italic emphasis added).

> 18. **Miscellaneous Matters.**
>
> (a) **Further Assurances.** After the Closing, Seller and Buyer shall execute and deliver, and shall otherwise cause to be executed and

---

[3] An "AMI" agreement is an agreement concerning an "area of mutual interest." (Doc. # 74-6 at 138).

delivered, from time to time, such further instruments, notices, division orders, transfer orders and other documents, and do such other and further acts and things, as may be reasonably necessary to more fully and effectively grant, convey and assign the Properties to Buyer and to otherwise carryout the transaction contemplated hereby. Without limiting the foregoing, if after Closing it is determined that Seller owns Property being hereby sold by Seller to Buyer as described in Section 1(a), (c), or (d) hereof *within the geographic areas outlined in blue on the map attached hereto as **Exhibit J*** which were inadvertently omitted from the Assignment contemplated hereunder, Seller shall convey such interests to Buyer for no additional consideration, and the parties will otherwise proceed to take such actions with respect to such interests as would have occurred if such interests had been included in the Closing …

*Id.* at 34 (italic emphasis added).

Keller did not incorporate similar limiting language into the EQT PSA. (Doc. # 74-6 at 108, 172-175). Nor did he inform EQT that KRCC had sought such revisions. *Id.*

On October 4, 2001, the EQT PSA was executed. (Docs. # 71 at 5; 74-19). On that same day, EQT and KRCC executed their Amended Joint Venture Agreements to exclude their joint-venture properties being sold to Journey. (Doc. # 74-18). The KRCC PSA was executed several days later, on October 9, 2001. (Docs. # 71 at 5; 74-20). Immediately thereafter, a due-diligence period commenced for the Journey Transaction. (Doc. # 74-6 at 39-40). And on November 30, 2001, the Journey Transaction closed. (Doc. # 71 at 5).

EQT and Journey's agreement was memorialized in three documents: the PSA, the Master Assignment, and the Oil and Gas Lease. The PSA sets forth the details of the transaction and identifies the interests EQT sold to Journey. (Doc. # 74-19). Several exhibits were attached to and incorporated into the PSA. Exhibit A lists several hundred property interests and details the name, acreage, and other information about each individual interest. *Id.* at 57-67. The Blue Line Boundary Maps were attached to the PSA

as Exhibit N.  *Id.* at 196-207.  The Master Assignment and the Oil and Gas Lease were executed at the closing on November 30, 2001.  (Docs. # 71-19; 71-20).  The Master Assignment grants to Journey subleases in certain lands that EQT had already leased from third parties, and the Oil and Gas Lease provides that EQT would lease certain properties to Journey for at least five years.  *Id.*

In the years that followed the 2001 Journey Transaction, both EQT and Journey continued their respective oil exploration and drilling operations in southeastern Kentucky. (Doc. # 74 at 20).  During this time, EQT sought title opinions from various attorneys, including the Phillips Defendants, before drilling additional wells.  (Docs. # 73-3; 73-4; 73-5; 73-6; 73-7; 73-8; 73-9; 73-10).  When requesting title opinions, EQT did not inform Phillips about the Journey Transaction.  (Doc. # 70-6 at 67-68, 78).  And when rendering his title opinions, Phillips's inquiry stopped when he reached EQT's acquisition of the lease.  (Doc. # 73-1 at 11-12).  Put another way, Phillips did not examine EQT's "title as a lessee" or attempt to determine "what, if anything, [EQT] had done with the lease" because his examination was limited to the "oil and gas ownership" estate.  *Id.* at 12.

In April of 2006, questions arose internally within EQT about the Fordson Coal Lease.  (Doc. # 71-23).  Specifically, Sam Smallwood, a Landman in EQT's Land Department noticed that the entire leased acreage of the Fordson Coal Lease—which consists of 6,333 acres across Perry, Letcher, and Leslie Counties—was listed on the Perry County Assignment, but was not listed on the assignments to Journey that covered Letcher and Leslie Counties.  *Id.* at 2.  Although Smallwood and a member of EQT's Land Administration Group, Michele Weber, believed that "the intent was to only sell Journey the acreage of the lease located in Perry County" and to "keep the acreage in Letcher

and Leslie Counties along with the wells in those counties," they reached out to Zitkus for advice. *Id.* Zitkus agreed with Smallwood and Weber's "collective assessment," but thought that EQT "should confirm the intent" and suggested contacting Greg Shockley, who worked at Journey, to pursue a "corrective assignment." *Id.*

Smallwood followed Zitkus's suggestion and met with Shockley on August 11, 2006. (Doc. # 71-24). During this meeting, Smallwood and Shockley discussed the Fordson Coal Tract, among other things. *Id.* With respect to the Fordson Coal Tract, Shockley memorialized his discussion with Smallwood as follows:

> We have never claimed the portion in Letcher County. Not in P&SA, maps, assignments, etc. Probably should have been excluded in the first place to make clear but I don't see that we have any claim to this parcel. Told him I thought we would be willing to execute some type of letter agreement saying this.

*Id.* at 2. Shockley's memorandum regarding his meeting with Smallwood was forwarded to Journey's President, Brian Baer, but no curative assignment was executed. (Doc. # 71-11 at 16).

On October 9, 2006, EQT obtained a title opinion from William Davidson, an attorney in Pikeville, regarding the Letcher County portion of the Fordson Coal Lease. (Docs. # 71-27 at 42-44; 73-12). Although Smallwood had not informed Davidson about the potential issues with the Fordson Coal Lease, he issued a memorandum approving drilling based on the title opinions, and EQT began drilling wells on the Letcher County portion of the Fordson Coal Lease in December of 2006. (Doc. # 71-11 at 69-92).

Issues with the Journey Transaction resurfaced in 2009. (Doc. # 71-25). Specifically, Mary Beth Mazzei, an Accounting/Land Clerk with Journey, e-mailed Smallwood in February of 2009 regarding missing lease files. *Id.* at 3. Shawn Columbus,

a Contract Analyst with EQT responded to Mazzei and informed her that the leases did "not appear to be a part of the 2001 acquisition." *Id.* at 2. In reply, Mazzei informed Columbus that although the leases did not appear on the 2001 acquisition, they were "exhibited on the maps" and "included" in the PSA. *Id.*

After Mazzei and Columbus exchanged several other e-mails, detailing their conflicting research and explaining their positions, higher-ups at EQT and Journey joined the discussion. (Doc. # 71-15). Again, Smallwood and Shockley[4] discussed the parties' "intent" with respect to the Journey Transaction. *Id.* at 5. And Shockley reminded Smallwood that they had "found several errors/omission[s]" in the PSA and maps, but had "always been able to work [issues] out in the past." *Id.* at 6. Shockley also suggested that EQT and Journey "document this and the Fordson Coal Tract Parcel in some fashion." *Id.* As best the Court can tell, these issues were not resolved, and drilling continued.

In 2011, Journey contacted EQT regarding alleged trespasses. (Doc. # 71-14). Specifically, Journey claimed that since 2007, EQT drilled at least fifteen "gas wells on the property covered by the Fordson Lease that Journey owns." *Id.* at 2. Through the summer of 2012, EQT and Journey exchanged correspondence and attempted to resolve the dispute amicably. (Doc. # 71-15). The parties, however, maintained their positions, with Journey alleging that EQT had conveyed the entire 6,333 acres of the Fordson Coal Lease to Journey, and EQT contending that "it was the intent of the parties at the time of the 2001 transfer that only certain" portions of the Fordson Coal acreage—those in Perry County and not those in Letcher or Leslie Counties—"would be sold to Journey." *Id.* at 2.

---

[4]    Later in 2009, Shockley left Journey and began working for EQT. (Doc. # 71-10 at 4).

In June of 2012, EQT reached out to Keller, seeking advice regarding the dispute over the Fordson Coal Lease and the lease of the fee tracts. (Doc. # 74-22). By e-mail dated June 8, 2012, Keller indicated that he had reviewed his Journey files and relayed his legal opinions:

> With respect to Fordson Coal lease, not only is this only listed on the Perry County assignment, but Ex A to the PSA lists this lease as only being in Perry County. However, it lists the entire acreage and the PSA says the seller's entire interest in the leases will be conveyed. I don't find anything else about this lease and have no recollection of this being raised. My sense is that you have a good argument that what was intended to be included was the lease insofar as it covers land in Perry County only. This is certainly the way the parties acted post-closing. I was hopeful the asset allocation schedule might be helpful, but that only allocated the purchase price among wells, not acreage. However, if the only wells on this lease were in Perry, that is helpful in showing no value was given on lease rights in the other counties.

*Id.* at 2.

Five days later—on June 13, 2012—Journey filed suit against EQT in the Eastern District of Kentucky, seeking a declaration that the 2001 transaction transferred to Journey all property interests described in Exhibit A, regardless of whether those properties were inside or outside of the blue line boundaries on Exhibit N. *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, No. 6:12-cv-108-GFVT-EBA (E.D. Ky. 2012) (Doc. # 1 therein). Journey also alleged that EQT had trespassed by drilling and operating certain wells on Journey's property (now known as the "Trespass Wells"). *Id.*

On August 18, 2014, after both EQT and Journey sought summary judgment, Judge Van Tatenhove ruled in Journey's favor, finding that the transaction documents unambiguously conveyed to Journey those properties listed on Exhibit A, and that the transaction was not limited to the properties depicted within the blue line boundaries on Exhibit N. *Id.* (Doc. # 141 therein); *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F.

Supp. 3d 877 (E.D. Ky. 2014). This interpretation led Judge Van Tatenhove to conclude that EQT had trespassed on Journey's property. *Id.* Nonetheless, genuine issues of material fact precluded summary judgment, and the question of whether EQT's trespasses had been committed in good faith was left for a jury. *Id.* On September 8, 2014, the jury trial commenced. *Id.* (Doc. # 186 therein). Four days later—on September 12, 2014—the jury found that EQT had trespassed in bad faith and returned a verdict in favor of Journey. *Id.* (Doc. # 195 therein).

On June 24, 2015, Judge Van Tatenhove denied EQT's post-trial motions, requesting judgment as a matter of law and a new trial. *Id.* (Doc. # 220 therein); *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, No, 6:12-cv-108-GFVT, 2015 WL 3893003 (E.D. Ky. June 24, 2015). And the next day—June 25, 2015—Judge Van Tatenhove entered judgment in favor of Journey, awarding Journey an amount of stipulated damages and prejudgment interest. *Id.* (Doc. # 221 therein). Thereafter, Judge Van Tatenhove's and the parties' attention turned toward the logistics of enforcing the court's orders and transferring the property interests. *Id.* (Doc. # 226 therein); *Journey Acquisitions-II, L.P. v. EQT Prod. Co.*, No. 6:12-cv-108-GFVT, 2015 WL 9461387 (E.D. Ky. July 24, 2015). As part of that process, the parties filed a Joint Stipulation regarding Journey's damages on July 31, 2015. *Id.* (Doc. # 227 therein). And finally, on August 5, 2015, Judge Van Tatenhove entered a Final Judgment. *Id.* (Doc. # 230 therein); *Journey Acquisitions-II, L.P. v. EQT Prod. Co.*, No. 6:12-cv-108-GFVT, 2015 WL 4985728 (E.D. Ky. Aug. 5, 2015). On September 2, 2015, EQT appealed to the United States Court of Appeals for the Sixth Circuit. *Id.* (Doc. # 241 therein). Ultimately, that appeal was unsuccessful. *Id.* (Doc. # 251 therein); *Journey Acquisitions-II, L.P. v. EQT Prod. Co.*, 830 F.3d 444 (6th Cir. 2016).

While its appeal was pending, EQT filed separate legal-malpractice actions against the Defendants—first suing the Vorys Defendants on August 17, 2015, and then suing the Phillips Defendants almost one year later, on August 2, 2016.  On January 30, 2017, the two cases were consolidated.[5]  (Doc. # 35); *see also EQT Prod. Co. v. Phillips*, 7:16-cv-164-DLB-EBA (E.D. Ky. 2016).   This matter is now before the Court upon both the Phillips Defendants' and the Vorys Defendants' Motions for Summary Judgment.  (Docs. # 70 and 71).  Both Motions are fully briefed (Docs. # 70, 73, 75; 71, 74, 78), and ripe for the Court's review.

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "there is sufficient evidence … for a jury to return a verdict for" the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Once a party files a properly supported motion for summary judgment, by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  However, "the mere existence of a scintilla of evidence in support of the [non-moving

---

[5]     Prior to the cases being consolidated, the Vorys Defendants filed a Third-Party Complaint against the Phillips Defendants, asserting crossclaims for contribution/apportionment and indemnity.  (Doc. # 23).

party's] position will be insufficient." *Id.* at 252.

The Court must "accept Plaintiff's evidence as true and draw all reasonable inferences in [EQT's] favor." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255). The Court is not permitted to "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial." *Id.* (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52). If there is a dispute over facts that might affect the outcome of the case under governing law, the entry of summary judgment is precluded. *Anderson*, 477 U.S. at 248.

As the moving parties, the Defendants must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of EQT's legal-malpractice claims. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming Defendants satisfy their burden, EQT "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

## B. Applicable Law

Before considering the issues raised in the Motions for Summary Judgment, the Court must determine which state's law governs. As a federal court sitting in diversity, the Court must apply "the choice of law rules of the forum state." *Hayes v. Equitable*

*Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 796 (1941)). Therefore, Kentucky choice-of-law rules govern.

Although the parties do not address the choice-of-law issue in their briefs, they apparently believe that Kentucky law applies, and the Court agrees. EQT has alleged that the Defendants are liable in tort for professional negligence. Because this is a tort action, Kentucky law will apply "if there are significant contacts—not necessarily the most significant contacts—with Kentucky." *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972); *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009).

Here, there are significant contacts with Kentucky. Although EQT is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania (Doc. # 1 at ¶ 1), Keller is a citizen of Arizona, and Vorys is an Ohio limited-liability partnership with is principal place of business in Columbus, Ohio (Doc. # 23 at ¶¶ 1-2), all other contacts point to Kentucky. Phillips is a citizen of Kentucky, as is his sole proprietorship, Phillips Law Office. (Doc. # 23 at ¶¶ 3-4). Furthermore, the Defendants' alleged malpractice is based on transaction documents and title opinions that relate to property and oil wells located in Kentucky, and the underlying *Journey* Litigation was filed, tried, and resolved in Kentucky. Given the strong preference for applying Kentucky law[6] and the significant contacts with the state, Kentucky law applies to this action. Accordingly, the Court will apply federal procedural law and Kentucky substantive law to resolve the Motions for Summary Judgment.

---

[6] Kentucky courts are "very egocentric or protective concerning choice of law questions" and thus, there is a strong preference for applying Kentucky law. *Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355, 357 (Ky. Ct. App. 1987), *overruled on other grounds by Oliver v. Schultz*, 885 S.W.2d 699 (Ky. 1994); *see also Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000).

## C.    Statute of Limitations

Kentucky law[7] establishes a one-year statute of limitations for professional negligence claims, which includes legal malpractice:

> Notwithstanding any other prescribed limitation of actions which might otherwise appear applicable … a civil action, whether brought in tort or contract, arising out of any act or omission in rendering, or failing to render, professional services for others shall be brought within one (1) year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party injured.

Ky. Rev. Stat. Ann. § 413.245.

Here, the parties agree that a one-year statute of limitations applies. They disagree, however, on when EQT's legal-malpractice claims accrued—that is, the date on which the applicable one-year statute of limitations began to run. EQT argues that its legal-malpractice claims accrued when the final order was entered in the underlying *Journey* Litigation—on August 5, 2015. (Docs. # 73 at 22; 74 at 45). Defendants, on the other hand, insist that EQT's legal-malpractice claims accrued much earlier, and propose a multitude of dates, all of which predate August 5, 2015, and would render EQT's claims untimely. (Docs. # 70 and 71).

Construing Ky. Rev. Stat. Ann. § 413.245, the Kentucky Supreme Court has held that the statute establishes "two separate statutes of limitations": the "occurrence" limitation and the "discovery" limitation. *Michels v. Sklavos*, 869 S.W.2d 728, 730 (Ky. 1994). "The 'occurrence' limitation period begins to run upon the accrual of the cause of action." *Queensway Fin. Holdings Ltd v. Cotton & Allen, P.S.C.*, 237 S.W.3d 141, 147

---

[7]    The statute of limitations applicable in a federal diversity action is controlled by state law. *Anderson v. Chesley*, No. 2:10-cv-116-DCR, 2010 WL 4736833, at *11 (E.D. Ky. Nov. 16, 2010) (citing *Nw. Nat'l Ins. Co. v. Osborne*, 573 F. Supp. 1045, 1047 (E.D.Ky.1983)); *see also Bowden v. City of Franklin*, 13 F. App'x 266, 274 (6th Cir. 2001).

(Ky. 2007). The "accrual rule is relatively simple: 'A cause of action is deemed to accrue in Kentucky where negligence and damages have both occurred.'" *Id.* (quoting *Sklavos*, 869 S.W.2d at 730) (internal alterations omitted). "The use of the word 'occurrence'" in Ky. Rev. Stat. Ann. § 413.245 "indicates a legislative policy that there should be some definable, readily ascertainable event which triggers the statute." *Id.* (citing *Sklavos*, 869 S.W.2d at 730). And the "so-called 'triggering event' is 'the date of irrevocable non-speculative injury.'" *Saalwaechter v. Carroll*, 525 S.W.3d 100, 105 (Ky. Ct. App. 2017) (quoting *Doe v. Golden & Walters, PLLC*, 173 S.W.3d 260, 271 (Ky. Ct. App. 2005)). Put simply, the "statute of limitations for legal malpractice does not begin to run until the legal harm becomes fixed and non-speculative." *Doe*, 173 S.W.3d at 271 (internal citations and quotation marks omitted).

The other limitations period—the "discovery" limitation period—"begins to run when the cause of action was discovered or, in the exercise of reasonable diligence, should have been discovered." *Queensway*, 237 S.W.3d at 147 (citing *Sklavos*, 869 S.W.2d at 730). The discovery provision comes into play only if a suit for legal malpractice was filed more than one year after the date of the occurrence. *Id.* at 148. Thus, the discovery provision "often functions as a 'savings' clause or 'second bite at the apple' for tolling purposes." *Saalwaechter*, 525 S.W.3d at 105 (quoting *Queensway*, 237 S.W.3d at 148).

"Where a plaintiff claims that its suit was filed within the limitations period under both the accrual and discovery rules," as EQT does here, the Court must evaluate the timeliness of the claim "separately under both the accrual and discovery rules." *Queensway*, 237 S.W.3d at 148. Accordingly, the Court's analysis will begin with the

occurrence rule, and then, if necessary, turn toward the discovery rule.

Again, legal malpractice has not occurred—and such a claim does not accrue— "until there has been a negligent act and reasonably ascertainable damages are incurred." *Pedigo v. Breen*, 169 S.W.3d 831, 833 (Ky. 2004). The Defendants' allegedly negligent acts occurred when they performed legal services for EQT—in 2001, when the Vorys Defendants drafted the Journey Transaction documents, and between 2003 and 2010, when the Phillips Defendants provided title opinions to EQT. "But under the [legal] malpractice statute of limitations, mere knowledge of some elements of a tort claim, such as negligence without harm, is insufficient to begin running the limitations period where the cause of action does not yet exist." *Queensway*, 237 S.W.3d at 148 (citing *Sklavos*, 569 S.W.2d at 731-32). The question becomes, then, when did EQT's damages become fixed and non-speculative?

The Vorys Defendants argue that EQT's damages became fixed and non-speculative before the underlying *Journey* Litigation was final and advance four dates for accrual. First, the Vorys Defendants claim that any alleged malpractice occurred in 2001, when the documents were drafted and the transaction was completed, because on that date the entirety of the Fordson Coal Lease was conveyed to Journey. (Doc. # 71 at 33). The Vorys Defendants also point to 2006, when EQT realized that "a curative document from Journey amending the … transaction was necessary before [EQT] could drill certain wells on the Fordson Lease." *Id.* at 32-33. At the latest, the Vorys Defendants claim, EQT's damages became fixed and non-speculative on June 13, 2012, when Journey sued EQT, or September 12, 2014, when the jury found EQT to be a bad-faith trespasser. *Id.* at 33.

The Phillips Defendants also suggest several points in time for accrual and argue that EQT's damages became fixed and non-speculative on: (1) June 13, 2012—the date Journey filed suit against EQT; (2) June 26, 2013—the date Phillips was deposed in the *Journey* Litigation about the extent of his title examination; (3) September 10, 2014—the date Phillips testified at the jury trial in the *Journey* Litigation; (4) September 12, 2014— the date the jury returned a verdict against EQT; or (5) July 31, 2015—the date Journey and EQT entered into a stipulation of damages. (Doc. # 70-1 at 14-17).

In response, EQT contends that commencing the statute of limitations on any date earlier than August 5, 2015, would lead to absurd results, requiring EQT to file suit against the Phillips Defendants and the Vorys Defendants, without first knowing whether it prevailed in the *Journey* Litigation. (Doc. # 74 at 40). Accordingly, EQT claims that the final judgment in the *Journey* Litigation, which was entered on August 5, 2015, "marked the first time that EQT even arguably sustained fixed and non-speculative damages for purposes of the statute of limitations." *Id.* at 45.

To determine the accrual date for a legal-malpractice claim, Kentucky law draws a distinction between "malpractice cases in which the underlying negligence occurred during the course of formal litigation" and cases where "the malpractice arose from legal work that was not part of formal litigation." *Faris v. Stone*, 103 S.W.3d 1, 5 (Ky. 2003). "When a claim for legal malpractice is based on litigation negligence,[8] whether the attorney's negligence has caused any injury or damages necessarily is contingent on the final outcome of the underlying case" and "[a]ny alleged injury is merely speculative until

---

[8]     Litigation negligence occurs when an attorney is negligent "in the preparation and presentation of a litigated claim resulting in the failure of an otherwise valid claim." *Sklavos*, 869 S.W.2d at 730.

… the underlying litigation is final." *Doe*, 173 S.W.3d at 71. For that reason, Kentucky courts have "consistently held that the injury becomes definite and non-speculative when the underlying case is final." *Faris*, 103 S.W.3d at 5. Therefore, if EQT's legal-malpractice claims were based on litigation negligence, August 5, 2015—the date the *Journey* Litigation became final—would supply the accrual date.

EQT's legal-malpractice claims, however, are not based on litigation negligence. They are premised on "legal work that was not part of formal litigation"—the Vorys Defendants' drafting of transaction documents and the Phillips Defendants' preparation of title opinions. *Id.* And so, EQT's alleged injury may have become fixed and non-speculative before the underlying *Journey* Litigation was finalized.

At first glance, a review of Kentucky caselaw reveals confusion, rather than clarity, regarding the application of the "occurrence" rule in legal-malpractice cases that arise from legal work that was not part of formal litigation. *Compare Meade Cty. Bank v. Wheatley*, 910 S.W.2d 233 (Ky. 1995) (holding that attorney's alleged negligence in preparing title opinion did not result in a fixed and non-speculative injury until the date of the foreclosure sale) *with Housing Plus, Inc. v. Estate of Ross*, No. 2011-CA-1453-MR, 2014 WL 2536864 (Ky. Ct. App. June 6, 2014) (holding that plaintiff's injury, allegedly caused by attorney's negligence in preparing title opinion, became fixed and non-speculative when concerns over the attorney's legal work were expressed). A closer examination, however, exposes a critical factor that explains the seemingly contradictory cases: the existence of ongoing negotiation or litigation, the outcome of which determines whether the plaintiff was injured by the alleged malpractice.

Take *Meade County Bank* and *Housing Plus*, for example. In *Meade County Bank*, the Kentucky Supreme Court determined that the attorney's allegedly negligent title opinion, which failed to disclose a prior recorded mortgage, did not give rise to a fixed and non-speculative injury until the foreclosure sale because "[p]rior to that date, [the Bank] had only a fear that they would suffer a loss on the property" and "[t]hat fear was not realized as damages until the sale of the property." *Meade Cty. Bank*, 910 S.W.2d at 235. "At that time, what was merely probable became fact, and thus commenced the running of the statute" of limitations. *Id.* By contrast, in *Housing Plus*, the Kentucky Court of Appeals determined that the attorney's allegedly negligent title opinion gave rise to a fixed and non-speculative injury when the real-estate transactions took place and concerns over the attorney's legal work were expressed. *Housing Plus*, 2014 WL 2536864, at *3. But, in so holding, the Kentucky Court of Appeals made clear that "there was no question of liability" because Housing Plus had "failed to demonstrate or provide any evidence of ongoing negotiations or underlying litigation with the third-party entities that asserted the tax liens on the respective properties." *Id.* at *4.

When the alleged malpractice involves the structure of a transaction or the drafting of a contract, results have varied along the same lines. In *Alagia, Day, Trautwein, & Smith v. Broadbent*, the Kentucky Supreme Court held that the statute of limitations on a legal-malpractice claim based on unintended tax consequences from allegedly negligent estate planning did not accrue until the plaintiffs' settlement negotiations with the IRS concluded. *Alagia, Day, Trautwein, & Smith v. Broadbent*, 882 S.W.2d 121 (Ky. 1994). Specifically, the Kentucky Supreme Court reasoned that "[n]ot until damages were fixed by the final compromise with the IRS was there an occurrence of the type required to commence the

running of the statute." *Id.* at 126. Similarly, in *Butler & Associates, P.S.C. v. Harrod*, the Kentucky Court of Appeals determined that the attorney's alleged negligence in drafting an employment contract did not result in a fixed and non-speculative injury until the underlying contract action between the employer and the employee was resolved. *Butler & Assocs., P.S.C. v. Harrod*, No. 2008-CA-294-MR, 2009 WL 485040 (Ky. Ct. App. Feb. 27, 2009). Relying on *Broadbent*, the *Butler* Court held that the existence, and the extent, of any legal harm to the plaintiff "could not be determined until the contract claim was resolved." *Id.* at *5. Therefore, until the underlying litigation was final, "any damages remained speculative." *Id.* at *5.

That being said, not just any ongoing negotiation or litigation will delay accrual. If the related litigation merely confirms the alleged professional negligence, such litigation will have no effect on the accrual of the legal-malpractice claim. *See Queensway*, 237 S.W.3d at 149 (holding that any damages that plaintiff suffered because of the allegedly negligent audit and valuation became fixed and non-speculative when the plaintiff purchased the overpriced company and explaining that the order from the Indiana Department of Insurance requiring the plaintiff "to adjust the reserves did not change this fact; it at most constituted inescapable proof of the prior misevaluation"). Nor does litigation, which is simply "collateral to, and wholly independent of" the attorney's alleged malpractice, delay accrual. *See Saalwaechter*, 525 S.W.3d at 106-07 (holding that plaintiff had "misconstrued the effect his federal litigation had" on his legal-malpractice claim because the Indiana Department of Financial Institution's denial of his pawn license was "collateral to, and wholly independent of," the attorney's alleged negligence in drafting the transaction documents by which plaintiff purchased the pawn store).

These principles hold true, even if the litigation may impact or increase the amount of damages the plaintiff incurs because of the attorney's alleged malpractice. *Id.* at 107 ("At that point, even if [plaintiff] may not have known the full extent of his damages in terms of the precise dollar amount, the fact of his injury was certainly irrevocable and non-speculative."). What matters is that "'plaintiff is certain that damages will indeed flow from defendant's negligent act,'" not the exact amount of damages. *Id.* at 106 (quoting *Bd. of Educ. of Estill Cty. v. Zurich Ins. Co.*, 180 F. Supp. 2d 890 (E.D. Ky. 2002)). "Whatever it means, 'fixed and non-speculative' does not mean that damages, to trigger the initiation of the limitations period, must be translatable into a specified dollar amount." *Id.* (quoting *Bd. of Educ. of Estill Cty.*, 180 F. Supp. 2d at 890). "Kentucky law has never required [that] much." *Id.* (quoting *Bd. of Educ. of Estill Cty.*, 180 F. Supp. 2d at 890).

In this case, the critical factor that delays accrual—the existence of ongoing negotiation or litigation, the outcome of which determines whether the plaintiff was injured by the alleged malpractice—is present. Although neither the Vorys Defendants nor the Phillips Defendants were personally involved in the *Journey* Litigation, the result of that litigation determined whether EQT suffered any injury from the Defendants' alleged malpractice.

Like in *Meade County Bank*, the Phillips Defendants' allegedly negligent title opinion did not give rise to a fixed and non-speculative injury until the *Journey* Litigation was finalized, because "[p]rior to that date, [EQT] had only a fear that they would suffer a loss on the property" and "[t]hat fear was not realized as damages until" Judge Van Tatenhove entered a final judgment, requiring EQT to convey those property interests and pay damages to Journey. *Meade Cty. Bank*, 910 S.W.2d at 235. In the same way,

EQT's legal-malpractice claim against the Vorys Defendants closely resembles the legal-malpractice claim in *Butler*. The Vorys Defendants' allegedly negligent drafting of the Journey Transaction documents did not result in a fixed and non-speculative injury until the underlying contract dispute between EQT and Journey was resolved. Put another way, had EQT prevailed in the underlying *Journey* Litigation, EQT would not have sustained an injury from the alleged malpractice. Therefore, the existence of any legal harm to EQT "could not be determined until the [*Journey* Litigation] was resolved." *Butler*, 2009 WL 485040, at *5.

Accordingly, EQT's legal-malpractice claims against the Defendants accrued when the final judgment was entered in the underlying *Journey* Litigation—on August 5, 2015. That date supplies the "occurrence" limitations period, not because EQT's legal-malpractice claims are based on litigation negligence, and not because EQT did not know the potential *amount* of damages, down to the penny, but because EQT's potential *for* damages was contingent on the final outcome of the *Journey* Litigation.[9] Because EQT's legal-malpractice claims were filed within one year of the date of the occurrence, and thus are timely, the Court need not consider whether the statute of limitations was tolled under

---

[9] The Court recognizes that there were multiple times during the *Journey* Litigation, before entry of the final judgment, when EQT's potential for damages was arguably certain. For example, on August 18, 2014, Judge Van Tatenhove granted summary judgment in Journey's favor and held that the transaction documents unambiguously conveyed the entirety of the Fordson Coal Lease to Journey. *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, No. 6:12-cv-108-GFVT-EBA (E.D. Ky. 2012) (Doc. # 141 therein). And on September 12, 2014, the jury returned a verdict in favor of Journey and found EQT to be a bad-faith trespasser. *Id.* (Doc. # 195 therein). Selecting either of those dates as the accrual date, however, ignores the realities of litigation, which often include motions to reconsider, motions for judgment notwithstanding the verdict, and motions for a new trial. Therefore, "whether the attorney's negligence has caused injury necessarily must await the final outcome of the underlying case." *Sklavos*, 869 S.W.2d at 730. And final means final. In fact, in litigation-negligence cases, Kentucky courts have held that such a claim does not accrue until "the result of the *appeal* of the underlying litigation is final and the trial court's judgment becomes 'the unalterable law of the case.'" *Id.* at 733 (citing *Hibbard v. Taylor*, 837 S.W.2d 500, 502 (Ky. 1992)) (emphasis added).

the discovery rule.

### D. EQT's Legal-Malpractice Claims

A plaintiff alleging legal malpractice "has the burden of proving (1) that there was an employment relationship with the defendant/attorney; (2) that the attorney neglected his duty to exercise the ordinary care of a reasonably competent attorney acting in the same or similar circumstances; and (3) that the attorney's negligence was the proximate cause of damage to the client." *Marrs v. Kelly*, 95 S.W.3d 856, 860 (Ky. 2003). An examination of these elements often gives rise to a "suit within a suit" because the plaintiff must "show that he/she would have fared better in the underlying claim; that is, but for the attorney's negligence, the plaintiff would have been more likely successful."[10] *Id.*

It is undisputed that EQT had an attorney-client relationship with both the Vorys Defendants and the Phillips Defendants. Therefore, to overcome the Defendants' Motions for Summary Judgment, EQT must establish the existence of a genuine issue of material fact as to each of the remaining elements: duty, breach, and causation. The first of these remaining elements, duty, "presents a question of law." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003) (citing *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 2448 (Ky. 1992)). "Breach and injury," on the other hand, "are questions of fact for the jury to decide." *Id.* citing *Lewis v. B & R Corp.*, 56 S.W.3d 432, 438 (Ky. Ct. App. 2001)). "The last element, legal causation, presents a mixed question of law and fact." *Id.* (citing *Deutsch v. Shein*, 597 S.W.2d 141, 145 (Ky. 1980)).

---

[10] Although an attorney's negligence in missing the statute of limitations is "the predominant circumstances in which the suit-within-a-suit approach is applied," it is not the "exclusive set of circumstances for which the suit-within-a-suit method is proper." *Osborne v. Keeney*, 399 S.W.3d 1, 10 n.17 (Ky. 2012). "The determining factor is whether the injury claimed is dependent on the merits of the underlying action." *Id.*

The Vorys Defendants challenge EQT's evidence in support of the first, second, and third elements—duty, breach, and causation. (Doc. # 71). The Phillips Defendants' argument is limited to EQT's proof regarding breach, and specifically, the lack of sufficient expert testimony. (Doc. # 70). The Court will therefore examine EQT's evidence for each element, addressing the Defendants' arguments in turn.

### 1. Duty and Breach

When an attorney-client relationship exists, Kentucky law imposes a high standard of care:

> The relationship is generally that of principal and agent; however, the attorney is vested with powers superior to those of any ordinary agent because of the attorney's quasi-judicial status as an officer of the court; thus the attorney is responsible for the administration of justice in the public interest, a higher duty than any ordinary agent owes his principal. Since the relationship of attorney-client is one fiduciary in nature, the attorney has the duty to exercise in all his relationships with this client-principal the most scrupulous honor, good faith and fidelity to his client's interest.

*Daugherty v. Runner*, 581 S.W.2d 12, 16 (Ky. Ct. App. 1978). Thus, "the standard of care is generally composed of two elements": care and skill. *Id.* "The first has to do with [the] care and diligence which the attorney must exercise." *Id.* "The second is concerned with the minimum degree of skill and knowledge which the attorney must display." *Id.*

"In determining whether that degree of care and skill exercised by the attorney in a given case meets the requirements of the standard of care aforementioned, the attorney's act, or failure to act, is judged by the degree of its departure from the quality of professional conduct customarily provided by members of the legal profession." *Id.* (internal citations omitted). Accordingly, an attorney's duty to his client is breached when "the attorney's act, or failure to act … depart[s] from the quality of professional conduct customarily provided by members of the legal profession," acting in the same or similar

circumstances.  *Daugherty*, 581 S.W.2d at 16.

### a.    The Vorys Defendants

EQT alleges that the Vorys Defendants breached their duty by drafting the EQT PSA in such a way that EQT conveyed property interests to Journey that EQT did not intend to sell.  In their Motion for Summary Judgment, the Vorys Defendants claim that Keller did not have a duty to limit the scope of the Journey Transaction to Exhibit N's Blue Line Boundary Maps for a single reason: nobody told him to do so.  (Doc. # 71 at 10). And in the absence of such specific instructions, the Vorys Defendants suggest that Keller had no duty to "somehow surmise an intent by EQT to limit the transaction."  *Id.* at 15.

In support of their Motion for Summary Judgment, the Vorys Defendants assert that "discovery has revealed that there is a complete absence of proof that Vorys and Keller were specifically informed that EQT wanted the transaction limited to the Exhibit N map."  *Id.* at 12.  Specifically, the Vorys Defendants claim that there is "not a single piece" of testimonial or documentary evidence "that anyone at EQT or elsewhere ever recalls telling Keller in 2001 that EQT intended for the transaction to be limited to the boundaries on a map."  *Id.* at 12-14.

EQT contests that characterization of the evidence.  Although the lapse of almost seventeen years has left witnesses without a specific recollection of any "oral communications advising Keller of EQT's intent to limit the 2001 Journey Transaction to the Blue Line Boundary Maps," EQT points the Court to several facts and documentary evidence from which a reasonable jury could determine that such an intent was conveyed to the Vorys Defendants.  (Doc. # 74 at 26-30).  Based on these facts, EQT claims that "a reasonable attorney" in Keller's position "knew, or at an absolute minimum should have

known," that EQT did not intend to sell "properties located outside of the Blue Line Boundary Maps, including the 2,142 acre Fordson Coal tract located in Letcher County," where EQT drilled the Trespass Wells. *Id.* at 31-32.

To begin, the duty an attorney owes to his client is dependent upon the representation undertaken. Specific instructions, however, are not a necessary prerequisite for an attorney's duty to act. "An attorney cannot completely disregard matters coming to his attention which should reasonably put him on notice that his client may have legal problems or remedies that are not precisely or totally within the scope of the task being performed by the attorney." *Daugherty*, 581 S.W.2d at 17. Therefore, to define the scope of an attorney's duty to his client, and determine whether that duty was breached, the Court must look beyond explicit directives from the client.

Generally, an "attorney who is employed to prepare legal documents has the duty to see that they are properly drawn." 7A C.J.S. Attorney & Client § 379 (2018). "Although an attorney is not an insurer of the document it drafts, the attorney may breach a duty toward the client when, after undertaking to accomplish a specific result, the attorney then fails to … effectuate the intent of the parties." *Id.* As the drafter, "[i]t is the attorney's responsibility to the client to select and employ words in the construction of documents the attorney prepares that will accurately convey the meaning intended." *Id.* Therefore, the "attorney should be careful and precise in the matter of semantics" and "should inform the client of the consequences of the document the attorney has drafted." *Id.* When the alleged drafting negligence involves specific contract terms, an attorney will not be "subject to liability for the failure to include a particular provision in a contract or agreement when there was no duty on the attorney's part to include such provision." *Id.*

The Kentucky Court of Appeals put these principles into action in *Scattoloni v. Hallenberg*, a legal-malpractice suit based on an attorney's failure to include or suggest specific provisions in a purchase agreement. *Scattoloni*, No. 2006-CA-1893-MR, 2008 WL 2219779 (Ky. Ct. App. May 30, 2008). In that case, the plaintiff, Tom Scattoloni, decided to sell Fleming, his wholesale floral company, and entered into negotiations with Walter J. Engel Company ("WJEC"). *Id.* at *1. Scattoloni "handled the negotiations with WJEC alone." *Id.* After six months of negotiations, Scattoloni contacted Hallenberg, an attorney, regarding the potential sale. *Id.* "In their initial meeting, Scattoloni did not disclose to Hallenberg that he had received two offers to buy" Fleming, "did not disclose the identity of either potential purchaser," did not inform Hallenberg that "he was personally negotiating with WJEC," and did not provide Hallenberg with "any documents regarding the sale." *Id.* While Scattoloni and Hallenberg "spoke only in general terms" regarding the potential sale, Hallenberg did advise Scattoloni about "the importance of having a 'first in line security' provision or having other personal guarantees incorporated into any potential purchase agreement." *Id.* After meeting with Hallenberg, Scattoloni "continued to personally negotiate" with WJEC. *Id.*

Nearly three months after their initial meeting, Scattoloni met with Hallenberg once again. *Id.* During this "second meeting, which lasted approximately an hour and a half, Scattoloni and Hallenberg discussed the ramifications of WJEC, a C corporation, acquiring Fleming, an S corporation; the importance and possible inclusion of security provisions such as personal and asset guarantees; and the benefits of 'tag-along' agreements." *Id.* Thereafter, Scattoloni "personally continued negotiating the terms of the sale … without consulting Hallenberg." *Id.* After securing "the final terms of the sale,

Scattoloni approached Hallenberg to review the purchase agreement." *Id.* In doing so, Hallenberg "suggested changes." *Id.* The purchase agreement was finalized in November 1995, and "[f]or approximately the next three years, Scattoloni received various payments outlined in the purchase agreement." *Id.* at *2. However, WJEC later became insolvent and failed to make required stock reimbursements to Scattoloni. *Id.*

In February 2005—almost ten years after Scattoloni and WJEC finalized the purchase—Scattoloni filed a legal-malpractice action against Hallenberg. Specifically, Scattoloni "alleged that Hallenberg had deviated from the standard of care for a lawyer by failing to advise Scattoloni about the necessity of including a default provision in the purchase agreement, which would have returned Fleming to Scattoloni in the event WJEC defaulted on its obligations under the purchase agreement." *Id.*

Affirming the trial court's grant of summary judgment in favor of Hallenberg, the Kentucky Court of Appeals focused on the attorney's limited representation and minimal involvement in the transaction and found that the plaintiff failed to create a genuine issue of material fact regarding duty and breach:

> Scattoloni claims that he did nothing to limit Hallenberg's representation of him regarding the sale of Fleming. Turning to the record, we find that Scattoloni personally handled all the negotiations with WJEC for the sale of Fleming. The record demonstrates that this process took well over a year to complete. In that time, Scattoloni met with Hallenberg approximately two to three times for a total of approximately three to four hours. During their first meeting, Scattoloni only discussed the potential sale of Fleming with Hallenberg in general terms. Furthermore, Scattoloni did not dispute that he had WJEC's financial information, which was less than stellar, yet Scattoloni never provided that information to Hallenberg. While Scattoloni claims he did nothing to limit Hallenberg's representation, the record does not support that contention. In light of Hallenberg's limited representation and the dearth of case law supporting Scattoloni's assertions regarding duty, Scattoloni has presented no affirmative evidence that Hallenberg violated any duty owed to Scattoloni.

*Id.* at *3.

*Scattoloni* and the instant case are somewhat analogous. Specifically, both cases involve alleged negligence in the drafting of a purchase agreement. And, like the plaintiff in *Scattoloni*, EQT started the process of selling its oilfields in southeastern Kentucky before retaining an attorney. However, despite those surface-level similarities, the Vorys Defendants' representation of EQT and their involvement in the Journey Transaction was not so limited.

When EQT decided to sell certain oil interests, it established the Data Room, solicited bids, and drafted the initial PSA without the advice or assistance of outside counsel. (Doc. # 74 at 6-7). But, before the bid deadline, EQT retained the Vorys Defendants. (Docs. # 71 at 5; 74 at 8; 74-8). After EQT accepted Journey's offer, the parties negotiated the details of the transaction. (Docs. # 74-6 at 73-75; 74-11; 74-14). Keller had significant involvement in this process, traveling to Pittsburgh to attend meetings between EQT and Journey, and even discussing details and terms directly with Journey (or Journey's attorney) during the course of the negotiations. (Doc. # 74-6 at 97-98, 174, 177, 189; 74-11). Keller also took an active role in editing and revising the PSAs, as well as EQT's Joint Venture Agreements with KRCC. (Docs. # 74-6 at 57-58, 141, 148-51, 194-95; 74-11; 74-16; 74-28). This active participation is further evidenced in the Vorys Defendants' invoice to EQT, which demonstrates that in September of 2001 alone, Keller and other Vorys attorneys devoted a total of 143.63 hours to the Journey Transaction. (Doc. # 74-11).

That the Vorys Defendants had significant involvement in the Journey Transaction is not, in and of itself, sufficient to prove that the Vorys Defendants breached their duty to

EQT.  EQT must also set forth specific facts from which a reasonable jury could determine that the Vorys Defendants breached their duty to EQT by drafting the PSA, which failed to effectuate EQT's intent to limit the Journey Transaction to Exhibit N's Blue Line Boundary Maps.  EQT has carried this burden.

EQT has set forth specific facts and documentary evidence from which a reasonable jury could determine that its intent to limit the Journey Transaction was conveyed to the Vorys Defendants.  As evidence of their intention to limit the Journey Transaction and Vorys Defendants' knowledge of that intention, EQT points to the red-lined PSA, which Zitkus faxed to Keller on September 3, 2001.  On that red-lined PSA, Zitkus claims he made a notation next to Section One, entitled "Property to be Sold and Purchased," instructing Keller to "Reference Boundaries." (Doc. # 74-10 at 14).  EQT also relies on KRCC's subsequent request that Keller insert similar limiting language referencing the Blue Line Boundary Maps (Exhibit J in the KRCC PSA) in that very same section and in another, which Keller did.   (Docs. # 74 at 15-16; 74-20 at 11, 34).  Additionally, EQT highlights Keller's involvement in amending the Joint Venture Agreements between EQT and KRCC, and his knowledge of the intent of those parties— namely, that KRCC "would follow [EQT's] lead in everything," that EQT and KRCC were not conveying all of their joint properties to Journey, and that EQT and KRCC would continue to be joint-venture partners.  (Docs. # 74-13; 74-15; 74-18).

Based on both Zitkus's and KRCC's revision requests, as well as the nature of the joint venture between EQT and KRCC, EQT argues that "a reasonable attorney" in Keller's position "knew, or at an absolute minimum should have known," that EQT did not intend to sell "properties located outside of the Blue Line Boundary Maps." (Doc. # 74 at

31-32).    Nonetheless, Keller did not incorporate similar limiting language into the EQT PSA.  (Doc. # 74-6 at 108, 172-175).  Nor did he inform EQT that he had made such a last-minute revision to the KRCC PSA.[11]  *Id.*

The Vorys Defendants disagree with EQT's deduction and claim that EQT's argument "would require Keller to act as a modern Sherlock Holmes, analyzing in great detail" joint-venture agreements, "lengthy faxes with cryptic notes, and a myriad of other 'clues' to determine" EQT's "unstated intent."  (Doc. # 78 at 3).  At this stage in the litigation, however, where the Court must accept EQT's evidence as true and draw all reasonable inferences in EQT's favor, summary judgment is not warranted.  *Anderson*, 477 U.S. at 255.  EQT has created a genuine dispute of material fact as to whether the Vorys Defendants breached their duty to EQT, and this issue must be resolved by the jury.

### b.    The Phillips Defendants

For its legal-malpractice claim against the Phillips Defendants, EQT claims that Phillips was negligent in performing various title examinations because he failed to search and certify the lessee title for the working interest estate, and instead, examined only the oil and gas ownership estate.  The Phillips Defendants argue that EQT has failed to create a genuine issue of material fact as to whether the Phillips Defendants breached their duty because EQT has not put forth sufficient expert testimony.  (Doc. # 70-1 at 9-11).

Under Kentucky law, legal-malpractice claims "require expert testimony except 'where the negligence is so apparent that a layperson with general knowledge would have no difficulty recognizing it.'"  *Greene v. Frost Brown Todd, LLC*, No. 3:14-cv-619-TBR,

---

[11]    It is worth noting that Keller did inform EQT about other revisions and provisions that KRCC requested.  (Doc. # 74-14 at 2).

2016 WL 6877746, at *6 (W.D. Ky. Nov. 21, 2016) (quoting *Stephens v. Denison*, 150 S.W.3d 80, 82 (Ky. Ct. App. 2004)). Whether an expert witness is required to prove a legal-malpractice claim is within the discretion of the trial court. *Gleason v. Nighswander*, 480 S.W.3d 926, 929 (Ky. Ct. App. 2016).

Kentucky courts have held that expert testimony is not necessary "in cases where a statute of limitations was missed," a "plea offer was not conveyed," or where an attorney had a conflict of interest. *Greene*, 2016 WL 6877746, at *6 (citing *Adkins v. Palermo*, No. 0:13-cv-136-HRW, 2014 WL 4542490, at *3 (E.D. Ky. Sept. 11, 2014)). By contrast, "Kentucky courts have required expert testimony in cases concerning trial preparation, trial strategy … qualified domestic relations orders … and an attorney's professional assessment of the law." *Id.* (citing *Gleason*, 480 S.W.3d at 929; *Burton v. Helmers*, No. 2008-CA-1470-MR, 2009 WL 4021148, at *2 (Ky. Ct. App. Nov. 20, 2009); *Thomas v. Yost Legal Grp.*, No. 2004-CA-1723-MR, 2005 WL 2174430, at *4 (Ky. Ct. App. Sept. 9, 2005)). Thus, the necessity of expert testimony is dictated by the nature of the alleged malpractice. If the alleged negligence involves the exercise of legal judgment or the application of complex legal principles, expert testimony is required to establish the standard of care, breach, and causation.

Here, the alleged negligence involves the extent and the completeness of a title examination. EQT claims that such negligence "is not beyond the ordinary comprehension of a lay juror." (Doc. # 73 at 14-15). A review of the relevant facts and the parties' arguments, however, reveals the legal complexities at issue.

When requesting title examinations, EQT sent correspondence detailing its request to the Phillips Defendants. For the Lucinda Hurt Tract and Andrew Hurt Tract,

EQT explained:

> The title opinion should certify ownership of the oil and gas estate underlying all of the subject tracts. For the drillsite and target tract, please identify the owner of the surface estate and the owner and lessee, if any, of the coal estate for notification purposes.

(Docs. # 73-3; 73-4). On July 11, 2003, the Phillips Defendants rendered the title opinion for the Lucinda Hurt Tract. (Doc. # 73-5). In that opinion letter, the Phillips Defendants represented that the records of the Perry County Clerk's Office had been examined "from sovereignty down to and including July 10, 2003 at 4:00 p.m." and identified EQT as the owner of the working interest "presumably held by production." *Id.* at 2-3. The title opinion for the Andrew Hurt Tract was rendered on the same day, represented that the records of the Perry County Clerk's Office had been examined from the prior title opinion "down to and including July 10, 2003 at 4:00 p.m." and identified EQT as the owner of the working interest. (Doc. # 73-6). At the bottom of that title opinion, under the heading "Exceptions and Requirements," the Phillips Defendants stated: "The title search for this opinion assumes the accuracy of the title opinion referred to above and that the subject lease is held by production." *Id.* at 3.

When requesting a title opinion for the Samuel Whitaker Tract on the Fordson Coal Lease on December 9, 2008, EQT detailed its request with slightly different terms:

> The title opinion should certify ownership of the oil and gas estate underlying the subject tract and identify the surface owner if possible. Please attach a copy of the severance deed to your opinion. If the subject mineral tract is owned by individual(s), attach a copy of the last vesting deed in the chain and identify any unreleased liens against those individuals.

(Doc. # 73-7). The Phillips Defendants rendered the title opinion for that tract on December 15, 2008, represented that the records of the Perry County Clerk's Office had been examined from the prior title opinion "down to and including December 12, 2008 at

4:00 p.m." and identified EQT as the owner of the working interest, but "assume[d]" that "the subject lease" was "held by production."  (Doc. # 73-8).

EQT's request for a title opinion for the B.F. French Tract on the Fordson Coal Lease, dated August 17, 2009, detailed the request as follows:

> The title opinion should certify ownership of the coal, oil and gas estate underlying the subject tract.  Please identify the owner of the surface estate and the coal lessee, if any, for notification purposes.  Please attach a copy of the severance deed to your opinion.  If the subject mineral tract is owned by individual(s), attach a copy of the last vesting deed in the chain and identify any unreleased liens against those individuals.

(Doc. # 73-9).  The Phillips Defendants rendered the title opinion for the B.F. French Tract on October 14, 2009, and like before, represented that the records of the Perry County Clerk's Office had been examined from the prior title opinion "down to and including October 13, 2009 at 4:00 p.m." and identified EQT as the owner of the working interest, with the notation "presumably held by production."  (Doc. # 73-10).

Based on the above evidence, the Phillips Defendants claim that EQT requested only an examination of the "oil and gas estate," which is a separate estate from the "working interest estate," and that the title opinions made clear that Phillips had assumed that the working interest was "held by production."  (Doc. # 75 at 1-2).  However, EQT argues that its title-opinion requests required the Phillips Defendants to search and certify the working interest.  (Doc. # 73 at 15).  The question, therefore, is: Would a reasonably competent attorney, who is asked to provide an oil and gas title opinion, breach the standard of care by failing to examine the lessee title for the working interest estate? Were the Court to ask any layperson walking down the street this question, it would expect to receive puzzled looks in response.  In fact, asking that question to an attorney—not well-versed in mineral rights and title examinations—would probably elicit an equally

confused reaction. Put simply, such negligence is not "so apparent that a layperson with general knowledge would have no difficulty recognizing it." *Stephens*, 150 S.W.3d at 82. Given the various terms of art, the intricacies of mineral interests and estates, and the complexity of title examinations, expert testimony is required to prove the negligence that EQT alleges against the Phillips Defendants.[12]

That raises the question, then, is EQT's proffered expert testimony sufficient to create a genuine issue of material fact regarding whether the Phillips Defendants breached their duty of care? The Phillips Defendants answer that question in the negative, and argue that the proffered expert testimony is "couched in subjective terms," focusing on the expert's own practice and experience, and therefore, fails to establish the objective standard of care. (Doc. # 70-1 at 12-13). But EQT claims that its proffered expert testimony is "sufficient to establish the standard of care and a breach of that standard of care." (Doc. # 73 at 16-19).

EQT's expert, James E. Kaiser, rendered his opinion based on his education, thirty-one years of experience examining oil and gas estate titles (six years as a petroleum landman and twenty-five years as an attorney), and the materials submitted to him by counsel. (Doc. # 48-1). In his Rule 26 Report, Kaiser opined as follows:

> It is my professional opinion that when EQT Production Company, or their predecessor, requested an oil and gas title opinion from Wilhoit & Kaiser at any time over the last 20 (twenty) years we were requested to certify the

---

[12] This conclusion is consistent with Kentucky caselaw, which has recognized the need for expert testimony in legal-malpractice cases involving title opinions. *See e.g.*, *Tipton v. Porter*, No. 2009-CA-1222-MR, 2010 WL 3641233 (Ky. Ct. App. Sept. 17, 2010) (holding expert testimony was necessary to prove that attorney was negligent by failing to undertake a complete title examination before drafting a deed warranting that the land was free of encumbrances and the title was marketable); *see also Huffman v. Baker*, Nos. 2005-CA-2031-MR, 2005-CA-2109-MR, 2006 WL 2846878 (Ky. Ct. App. Oct. 6, 2006) (holding expert testimony was necessary to prove negligence of attorney in rendering opinion regarding marketability of title, where attorney relied on esoteric after-acquired-title doctrine to determine interests of heirs had been extinguished).

title for certain estates, including the oil and gas estate, the oil and gas leasehold estate, the coal estate, and the surface estate. There were instances when the surface estate would not be requested but, I do not know of any instances in which EQT would not either expressly request the leasehold estate be certified, or any instances in which Wilhoit & Kaiser would not have certified the oil and gas leasehold estate in accordance with the nature and purpose of a drilling title opinion. Wilhoit & Kaiser has always certified the oil and gas leasehold estate on any opinion requested. Our basis for doing so is to provide the client with a third party assurance of what working interest they hold in the subject lease.

Based upon review of the title opinions at issue in this case and Dale Phillips' testimony, Mr. Phillips opined to and/or certified title to the oil and gas leasehold estate without performing a complete examination of that estate. Performance of such an examination would identify the transfer of the working interest in a lease. One of the factors to be considered in determining if bad faith mineral trespass damages should be awarded is whether the trespasser relied upon a complete title examination.

*Id.* at 1.

Despite the subjectivity of Kaiser's opinion, and his focus on the particular practices of his own law firm with respect to one specific client's title-opinion requests, EQT suggests that Kaiser's statement that he "always certified the oil and gas leasehold estate"—the "working interest" estate—"in accordance with the nature and purpose of a drilling title opinion" establishes the objective standard of care. (Doc. # 73 at 16). Alternatively, EQT argues that "at an absolute minimum, it is implicit in Kaiser's Report that a reasonable attorney in Phillips'[s] shoes knew or should have known that because EQT was requesting the title examination 'for the purpose of a drilling operation,' he should have examined and certified title to the working interest in the oil and gas estate." *Id.* at 16-17. The Phillips Defendants, however, claim that Kaiser's expert report fails to establish the objective standard of care or the Phillips Defendants' breach thereof. (Doc. # 70-1 at 12).

On this point, the Court agrees with the Phillips Defendants. As rendered, Kaiser's expert opinion is that when EQT requested a title opinion, his law firm interpreted that request to cover the "working interest estate," and not just the "oil and gas estate." (Doc. # 48-1 at 1). Kaiser then explains why his law firm interpreted EQT's request in that way. *Id.* And finally, Kaiser reiterates an undisputed fact—Phillips did not search and certify the "working interest" estate. *Id.*

That "opinion" amounts to nothing more than a description of what Kaiser and his law firm do when rendering title opinions for one client—EQT. All parties agree that the Phillips Defendants did something different. But, that begs the question: What should Phillips have done? Whether the Phillips Defendants breached their duty to EQT does not hinge on whether Phillips did something differently than Kaiser. For all the Court knows, Kaiser could be performing title examinations wrong as well, or he and his firm could be going above and beyond the standard of care. What matters is whether the Phillips Defendants deviated from the standard of care, not whether they performed title examinations differently than Kaiser and his law firm. Therefore, to create a genuine issue of dispute regarding breach, EQT must present evidence that the Phillips Defendants "depart[ed] from the quality of professional conduct customarily provided by members of the legal profession," when Phillips failed to search and certify the "working interest estate," and instead rendered title opinions that identified EQT as the owner of the working interest based on an "assumption" that it was "held by production." *Daugherty*, 581 S.W.2d at 16. Kaiser's expert report neither affords an answer, nor provides a basis for the jury to answer the critical question in this case: Did the Phillips Defendants breach their duty to EQT?

Even though Kaiser's expert report fails to establish the objective standard of care, and fails to opine that the Phillips Defendants breached that standard of care, EQT suggests that any deficiency could be cured at trial. (Doc. # 73 at 17). Specifically, EQT argues that Kaiser "is not limited to 'merely reading his report at trial'" because "Federal Rule of Civil Procedure 26(a)(2)(b) 'contemplates that the expert will supplement, elaborate upon, explain, and subject himself to cross-examination upon his report.'" *Id.* (quoting *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006)). While this is true, a party must comply with Rule 26(a)'s expert-report requirements before that expert can expound upon their expert report at trial.

Rule 26(a)(2)(B) requires the disclosure of an expert's report and also mandates the requirements of the report. Paramount among those requirements is that the expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). EQT attempts to argue that the Phillips Defendants shoulder the blame for Kaiser's rudimentary expert report due to their decision not to depose Kaiser; however, that logic is at odds with the caselaw in this Circuit. "Under Rule 26(a), a report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (internal citations and quotation marks omitted).

Kaiser's expert report falls far below Rule 26's requirements. Even a generous reading of Kaiser's expert report provides no explanation of the standard of care and fails to offer even a conclusory opinion that the Phillips Defendants breached the standard of

care, let alone the "basis and reasons" for such an opinion.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). And Rule 37(c)(1) "requires absolute compliance with Rule 26(a); that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or substantially justified.'" *Roberts ex. rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (citing *Vance v. United States*, 182 F.3d 920 (6th Cir. 1999) (table)). "The burden is on the potentially sanctioned party to prove harmlessness." *R.C. Olmstead, Inc.*, 606 F.3d at 272. EQT has argued only that expert testimony is not required and that its proffered expert testimony is sufficient to establish the standard of care and a breach thereof; therefore, the Court is unable to find that EQT's failure to comply with Rule 26(a) was substantially justified. (Doc. # 73 at 14-17). After the discovery deadlines in this case were extended several times, EQT was given until August 11, 2017, in which to identify their expert witnesses against the Phillips Defendants.[13] (Doc. # 47). That deadline having long since passed, EQT has failed to convince the Court that the deficiencies in Kaiser's expert report are harmless.

Because EQT was required to present expert testimony to establish the standard of care and a breach of that standard of care, and the proffered expert testimony is

---

[13] In accordance with this deadline, EQT disclosed a single expert: Kaiser. (Doc. # 48). Therefore, EQT's passing reference to William Davidson, an attorney who testified about his process for rendering oil and gas title opinions in the *Journey* Litigation, does not remedy EQT's lack of expert testimony in this case. (Doc. # 73 at 17).

insufficient, EQT has failed to put forth enough evidence to create a genuine issue of material fact as to whether the Phillips Defendants breached their duty to EQT.[14] Accordingly, the Phillips Defendants Motion for Summary Judgment (Doc. # 70) is **granted** and EQT's legal-malpractice claim against the Phillips Defendants is **dismissed**.

### 3. *Causation*

To avoid summary judgment in the Defendants' favor, EQT must also present a genuine issue of material fact regarding causation; that is, EQT must be able to show that the Defendants' alleged negligence was the proximate cause of its damages. *Marrs*, 95 S.W.3d at 860. To prove proximate cause, EQT must show that "but for the attorney's negligence," EQT would have "fared better" and "would have been more likely successful." *Id.*

### a. The Vorys Defendants

As for causation, the Vorys Defendants advance two arguments and claim they are entitled to judgment as a matter of law. (Doc. # 71 at 15-21, 35-37). The Court will address both arguments in turn.

First, the Vorys Defendants claim that EQT cannot prove causation because there is no evidence that, but for the alleged negligence in drafting the PSA, EQT would have fared better. *Id.* at 15-21. Specifically, the Vorys Defendants argue that there is "no evidence that Journey would have agreed to limit the scope of the transaction to the boundaries on the map." *Id.* "In addition to the lack of evidence that Journey would have agreed," the Vorys Defendants claim that "EQT is collaterally estopped … from arguing otherwise" because Judge Van Tatenhove found that Journey did not intend for the

---

[14] Unlike the Phillips Defendants, the Vorys Defendants have not challenged EQT's expert testimony. (Docs. # 71 and 78).

transaction to be limited, when he ruled against EQT in the underlying *Journey* Litigation. *Id.* at 17-19.

EQT responds with a three-pronged argument. First, EQT states that "speculating as to what Journey may or may not have done had Keller properly limited the sale for EQT just as he did for KRCC is not germane to the causation analysis." (Doc. # 74 at 34). Specifically, EQT claims that it had other options: it could have walked away from the deal if Journey did not agree to the Blue Line Boundary Map limitation or "at an absolute minimum, EQT would not have expended millions of dollars drilling various wells" on lands it did not own. *Id.* at 35. Second, EQT argues that "even if speculating as to what Journey may or may not have done had Keller properly limited the sale for EQT was germane to the causation analysis, EQT is not collaterally estopped from litigating this issue because it was not litigated" in the underlying *Journey* Litigation. *Id.* at 38. And third, EQT claims that "there is ample evidence that Journey would in fact have agreed to limit the sale to the Blue Line Boundary Maps, because it is undisputed that Journey put no value on the properties located outside the Blue Line Boundary Maps when it submitted its bid to purchase the properties and Journey "agreed to the limitation in the KRCC PSA without hesitation." *Id.* at 40.

To begin, what *would have* happened without the Vorys Defendants' alleged negligence is highly relevant to the causation analysis. In fact, the very nature of "but for" causation requires EQT to prove that it would have "fared better" and "would have been more likely successful," absent the alleged negligence. *Marrs*, 95 S.W.3d at 860. In legal-malpractice cases involving drafting negligence, the plaintiff can prove proximate cause by putting forth evidence that, absent the drafting error, the plaintiff would not have

been damaged.

In *Scattoloni*, the legal-malpractice claim was premised on Hallenberg's failure to suggest or include a default provision, which would have returned Fleming to Scattoloni when WJEC became insolvent and defaulted on its obligations under the purchase agreement. *Scattoloni*, 2008 WL 2219779, at *3. Therefore, the Kentucky Court of Appeals held that "Scattoloni was required to prove that, but for Hallenberg's alleged negligence, Scattoloni would have negotiated a purchase agreement containing a default provision that would have prevented his losses." *Id.* Scattoloni, however, failed to put forth any "affirmative evidence that, absent Hallenberg's alleged negligence, Scattoloni would have received the desired default provision." *Id.* Aside from "his own self-serving assertion," Scattoloni attempted to rely on deposition testimony of WJEC's President that WJEC "would have agreed to such a provision." *Id.* But, a review of that deposition revealed that WJEC's President had merely speculated about his agreeable nature, and supposed that his "attorney would have advised against the inclusion of such a default clause." *Id.* Moreover, the Court of Appeals found that Scattoloni could not prove but-for causation because a bank had a first-in-line security interest in all of WJEC's assets, including Fleming, and therefore, "[e]ven if Scattoloni's desired default provision had been included in the purchase agreement, it would not have prevented Scattoloni's losses." *Id.* at *4.

In this case, EQT has put forth sufficient evidence to create a genuine issue of material fact that, absent the Vorys Defendants' alleged negligence, the Journey Transaction would have been limited to the Blue Line Boundary Maps. To support this contention, EQT claims that Journey "agreed to the limitation in the KRCC PSA without

hesitation" and that Journey assessed no value to the properties located outside of the Blue Line Boundary Maps when it submitted its bid. (Doc. # 74 at 40). Additionally, EQT has presented evidence that at least one Journey employee—Greg Shockley—believed that the Letcher County portion of the Fordson Coal Lease "[p]robably should have been excluded in the first place" and "thought [Journey] would be willing to execute some type of letter agreement" clarifying the parties' rights to that tract. (Doc. # 71-24 at 2). Accepting EQT's evidence as true, and drawing all reasonable inferences in EQT's favor, this "evidence presents a sufficient disagreement to require submission to a jury."[15] *Anderson*, 477 U.S. at 251-52.

And contrary to the Vorys Defendants' arguments, collateral estoppel does not preclude EQT from presenting such evidence and pursuing that theory of causation. Collateral estoppel, also referred to as issue preclusion, "bars subsequent relitigation of a fact or issue where that fact or issue was necessarily adjudicated in a prior cause of action and the same fact or issue is presented in a subsequent suit." *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 589 (6th Cir. 2009). Collateral estoppel "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party … and of promoting judicial economy by preventing needless litigation."[16]

---

[15] Moreover, this Journey-would-have-agreed theory is not the only causation theory that EQT pursues. EQT also argues that even if Journey would not have agreed to limit the transaction to Exhibit N's Blue Line Boundary Maps, EQT "could have renegotiated or walked away from the transaction" or "at an absolute minimum, EQT would not have expended millions of dollars drilling various wells" if it had known that Journey owned those lands. (Doc. # 74 at 35). Those arguments would also prove that, absent the Vorys Defendants' alleged negligence, EQT could "have prevented [its] losses." *Scattoloni*, 2008 WL 2219779, at *3.

[16] That the Vorys Defendants were not involved in the underlying *Journey* Litigation is of no consequence. "Because the defendant in this case is the party invoking issue preclusion, defensive collateral estoppel, rather than offensive collateral estoppel, applies." *Georgia-Pacific Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012). And "[m]utuality between the parties is not required in defensive collateral estoppel cases so long as

*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979).

For a party to be barred by defensive collateral estoppel, four requirements must

be met:

> (1) the precise issue must have been raised and actually litigated in the prior proceedings; (2) the determination of the issue must have been necessary to the outcome of the prior proceedings; (3) the prior proceedings must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Georgia-Pacific Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098

(6th Cir. 2012) (citing *Cobbins*, 566 F.3d at 589-90)).

The party asserting collateral estoppel bears the burden of establishing each of

these elements. *Spilman v. Harley*, 656 F.2d 224, 229 (6th Cir. 1981); *Cent. Transp., Inc.*

*v. Four Phase Sys., Inc.*, 936 F.2d 256, 260 (6th Cir. 1991). The Vorys Defendants,

however, have failed to establish the first element: identity of issues.

In the underlying *Journey* Litigation, Judge Van Tatenhove considered whether

reformation of the EQT PSA was warranted based on mutual mistake. *Journey*

*Acquisition-II, L.P. v. EQT Prod. Co.*, No. 6:12-cv-108-GFVT-EBA (E.D. Ky. 2012) (Doc.

# 141 therein). A party seeking reformation of a contract must prove by "clear and

convincing evidence" that "the mistake was mutual, not unilateral" and that "the parties

actually agreed upon terms different from those expressed in the written instrument."

*Nichols v. Zurich Am. Ins. Co.*, 423 S.W.3d 698, 702-03 (Ky. 2014). As support for its

reformation request, EQT relied on similar evidence as it does here: that Greg Shockley,

a Journey employee, had indicated a similar understanding regarding the limits of the

---

'the plaintiff has had a full opportunity to litigate the contested issue previously.'" *Id.* at 1098-99 (quoting *McAdoo v. Dallas Corp.*, 932 F.2d 522, 523 (6th Cir. 1991)).

transaction in 2006; that Journey did not assign value to properties outside Exhibit N's Blue Line Boundary Maps; and the similarity of the simultaneous deal between Journey and KRCC. However, that evidence reflected the intent of the parties *after* the EQT PSA was executed and could not "be said to provide clear and convincing evidence of what [EQT and Journey] intended in 2001." *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, No. 6:12-cv-108-GFVT-EBA (E.D. Ky. 2012) (Doc. # 141 therein). Ultimately, Judge Van Tatenhove found that EQT had failed "to prove that Journey knew and intended for the conveyances to be limited by the Exhibit N map boundaries at the time the parties made the agreement," and rejected EQT's request for reformation. *Id.*

The question here, however, is not whether Journey intended to limit the transaction in 2001. Rather, the question is whether Journey *would have* agreed to limit the transaction, even if Journey did not have that intention initially. Or, to be more precise: If the Vorys Defendants had drafted the EQT PSA such that the transaction was limited to Exhibit N's Blue Line Boundary Maps, would Journey have agreed to such a provision? While those questions may be similar, they are not identical.[17] Without identity of issues, the Vorys Defendants' collateral estoppel argument is unavailing.

For their second causation argument, the Vorys Defendants claim that they are entitled to partial summary judgment because "EQT's own willful conduct caused the bad-faith component of the trespass damages," and therefore, "EQT cannot prove proximate cause to support a claim" against the Vorys Defendants for that portion of the damages. (Doc. # 71 at 35). In particular, the Vorys Defendants point to EQT's application for

---

[17]     The Court also notes that even if those issues were identical, the burdens of proof are different. To prove reformation of the agreement was warranted, EQT had to prove Journey's intent to limit the transaction in 2001 by clear and convincing evidence. In this case, however, the prototypical preponderance standard is the proper measure of proof.

permits, request for title opinions, amendment of assignments, and their decision to drill wells on property that they knew Journey may have a claim to. *Id.* at 37. EQT contests the Vorys Defendants' attempt to "absolve" Keller from liability, and claims that it was foreseeable that EQT would rely on their belief that the PSA was limited to the Blue Line Boundary Maps and proceed with their drilling operations. (Doc. # 74 at 50). As further support that the Vorys Defendants proximately caused EQT's damages, including their bad-faith damages, EQT points to Keller's e-mail in June 2012, where he opined that EQT had a "good argument" regarding their retention of the Fordson Coal Tract. *Id.* at 51. Lastly, EQT argues that comparative fault is an issue for the jury, if they determine that EQT is also at fault for a portion of the damage sustained. *Id.* at 52.

The crux of the Vorys Defendants' argument is that EQT's own conduct from 2006 through 2012 is a superseding cause of its damages. "Under Kentucky law, there is a difference between a superseding cause—which absolves the original tortfeasor of liability—and an intervening cause—which does not." *Total Renal Care, Inc. v. Childers Oil Co.*, 743 F. Supp. 2d 609, 616 (E.D. Ky. 2010) (citing *NKC Hosps., Inc. v. Anthony*, 849 S.W.2d 564, 568 (Ky. Ct. App. 1993)). Although "'the question of whether an undisputed act or circumstances is a superseding cause is a legal issue for the court to resolve and not a factual matter for the jury' … that is only true … when the superseding cause is indeed undisputed." *Id.* at 617 (quoting *Fryman v. Harrison*, 896 S.W.2d 908, 811 (Ky. 1995)). Here, EQT's actions are not undisputed. And more importantly, EQT's actions do not qualify as a superseding cause. "A superseding cause is a factor of such extraordinary, unforeseeable nature as to relieve the original wrongdoer of liability to the ultimate victim." *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 292 (Ky. Ct. App. 2009)

(citing *Briscoe v. Amazing Prods., Inc.*, 23 S.W.3d 228, 229 (Ky. Ct. App. 2000)). If the jury were to find that the Vorys Defendants were negligent in drafting the EQT PSA, EQT's drilling on property outside of the blue line boundaries is not so extraordinary or so unforeseeable as to relieve the Vorys Defendants from liability. Indeed, trespass is a foreseeable consequence of a negligently drafted agreement, which conveys lands the seller did not intend to convey.

Moreover, "the rationale for the doctrine of superseding cause has been substantially diminished by the adoption of comparative negligence." *Ky. Transp. Cabinet v. Babbitt*, 172 S.W.3d 786, 793 (Ky. 2005). "Under comparative fault, a jury is permitted to allocate fault to each party to the action, considering both the nature and conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed." *Nazar v. Branham*, 291 S.W.3d 599, 604 (Ky. 2009). Like in the underlying *Journey* Litigation, EQT's alleged conduct—applying for drilling permits, requesting title opinions, amending assignments, and deciding to drill wells on property that EQT knew Journey may have had a claim to—must be put before the jury, who will determine whether the Vorys Defendants are liable for EQT's bad-faith trespass damages, and who can assess the comparative fault of the parties. Because EQT has created a genuine dispute of material fact as to whether the Vorys Defendants' alleged negligence is the proximate cause of EQT's damages, this issue must be resolved by the jury. Therefore, the Vorys Defendants' Motion for Summary Judgment (Doc. # 71) is **denied**.

### III.    CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Defendants Dale A. Phillips and the Phillips Law Office's Motion for Summary Judgment (Doc. # 70) is hereby **granted**;

(2)    Plaintiff EQT Production Company's legal-malpractice claim against Defendants Dale A. Phillips and the Phillips Law Office is hereby **dismissed**, and the consolidated case, *EQT Prod. Co. v. Phillips*, 7:16-cv-164-DLB-EBA is **dismissed** and **stricken** from the Court's active docket;

(3)    Defendants John Keller and Vorys, Sater, Seymour and Pease, LLP's third-party claims for contribution/apportionment and indemnity against Defendants Dale A. Phillips and the Phillips Law Office (Doc. # 23) are hereby **dismissed**;

(4)    Defendants John Keller and Vorys, Sater, Seymour and Pease, LLP's Motion for Summary Judgment (Doc. # 71) is hereby **denied**; and

(5)    **Within twenty (20) days from the date of the entry of this Memorandum Opinion and Order**, the remaining parties shall file a **Joint Status Report**, setting forth available dates for a Final Pretrial Conference and Jury Trial, and whether they would be amenable to a court-facilitated settlement conference.

This 27th day of April, 2018.



Signed By:

*David L. Bunning*

United States District Judge

K:\DATA\Opinions\London\15-146 EQT Prod MSJs MOO.docx